IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DIAMOND MCMILLEN, | ) | Case No. 1:24-cv-0170 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| v. | ) | |
| | ) | |
| COMISSIONER OF SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, Diamond McMillen ("McMillen"), seeks judicial review of the final decision of the Commissioner of Social Security denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act. McMillen raises two issues on review of the Administrative Law Judge's ("ALJ") decision:

1.  Whether the ALJ cherry picked evidence in finding McMillen capable of frequent bilateral handling, fingering and feeling, and,

2.  Whether the ALJ failed to establish a logical bridge in evaluating pain symptoms.

This matter is before me pursuant to 42 U.S.C. 405(g) and 1383(c)(3). The parties consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. §636(c)(1). Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying McMillen's application for SSI is affirmed.

## II.    Procedural History

McMillen filed an application for SSI benefits on November 19, 2020, alleging her disability began February 20, 2018. (Tr. 183). The claims were denied initially, and again on reconsideration. (Tr. 120, 127). She then requested a hearing before an ALJ. (Tr. 130). McMillen

(represented by counsel) and a vocational expert ("VE") testified before the ALJ on February 1, 2023. (Tr. 38-62).

On February 22, 2023 the ALJ issued a written decision finding McMillen not disabled. (Tr. 15-37). The Appeals Council denied her request for review on November 29, 2023 thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-7). McMillen timely instituted this action on January 27, 2024. (ECF Doc. 1).

III.    Evidence

   A.    Personal, Educational and Vocational Evidence.

McMillen was 46 years old on the date her application was filed. (Tr. 35). She has at least a high school education.[1] (*Id.*). She has past relevant work as a parking lot attendant, a material handler, and a plumbing assembler. (*Id.,* Tr. 53-56).

   B.    Relevant Educational and Medical Evidence

Records submitted from the Cleveland Clinic Foundation indicate that McMillen attended an appointment with Dr. John Hanicak on January 19, 2018, where she was assessed with Attention Deficit Disorder; Anxiety; Cervical Disc Displacement; Herniated Cervical Discs at C4-5, C5-6, C6-7; and Unspecified Depression. (Tr. 460). On February 21, 2018, McMillen presented to the Fairview Hospital Emergency Department after being assaulted. (Tr. 441). She described being hit and kicked several times in her chest and left wall. (*Id.*). An x-ray revealed an acute displaced mid left clavicle fracture. (Tr. 441-43).

On December 18, 2018, McMillen underwent a cervical MRI exam which revealed posterior disc osteophyte formation, loss of disc height, uncovertebral hypertrophy, facet

_____

[1] The ALJ determined that McMillen has at least a high school education. McMillen did, however, state at a consultative examination that she left school after completing the 10th grade.

arthrosis, and multilevel central disc herniations. (Tr. 415). There was also a combination of prominence and ossification of the posterior longitudinal ligament mostly in the mid to lower cervical spine. (*Id.*). Dr. Jeremy Arps reviewed the MRI report and opined that hers was a complex situation, difficult to treat with surgery, and that she required a consultation with a psychologist and a chronic pain doctor. (Tr. 415-16).

On January 21, 2019, Dr. Hanicak noted that McMillen had been experiencing neck pain for 15 years, with the pain growing worse in the past year. (Tr. 412). The pain radiated into her bilateral posterior arms to her fingers causing occasional numbness and tingling in her hands. (*Id.*). She had weakness in in both arms and had a tendency to drop things. (*Id.*). She was treating with narcotic pain medications. (*Id.*). On June 7, 2019, she was assessed with intervertebral cervical disc disorder with myelopathy; attention deficit disorder; insomnia; chronic obstructive pulmonary disease ("COPD"); cord compression; and impacted cerumen. (Tr. 406). An MRI administered on September 19, 2019, was unchanged from the previous MRI. (Tr. 514). On October 11, 2019, she was further assessed with grief reaction following the death of her 23 year-old son. (Tr. 400).

On January 13, 2020, McMillen was treating with a pain management physician who prescribed her narcotic pain medications that provided some relief from her neck pain. (Tr. 276). Her assessment with the pain management physician included intervertebral disc disorder of the cervical region with myelopathy; cervical arthritis; and lumbar radiculopathy. (Tr. 276-77). On February 10, 2020, her pain management physician noted that McMillen's gait was normal, that she did not require an assistive device, but she did have painful range of motion when twisting or bending her neck. (Tr. 282). McMillen returned to see Dr. Hanicak on February 25, 2020, noting that her neck pain was worse than normal, which she attributed to the stress surrounding her

3

son's death. (Tr. 306). She was also experiencing right arm and right leg numbness with severe muscle spasms in her right leg. (*Id.*). Her physician noted inflammation on the left side of her neck on March 9, 2020, and that she was complaining of numbness and tingling of her bilateral wrists. (Tr. 288). McMillen further mentioned radiation down her right upper extremity on April 6, 2020, with pain she described as aching, pins and needles, numbness, pressure, weakness, burning, stabbing, heat, cold and vibration. (Tr. 292). She rated the pain a "5" on a scale of 1-10 while on medication. (*Id.*). McMillen continued to participate in pain management throughout 2020 with similar reports of symptoms, and pain self-assessments that typically were 5/10, occasionally rising as high as 8/10. (Tr. 813-47).

On August 19, 2020, Dr. Hanicak assessed her with mild persistent asthma; COPD; herniated cervical discs at C4-5, C5-6, C6-7; unspecified depression; and sleeplessness. (Tr. 327). On September 16, 2020, McMillen reported she had felt a burning sensation in her left thigh for two weeks. (Tr. 331). A lumbar MRI from November 24, 2020, showed moderate lumbar spondylosis, progressed at L3-4 and L4-5. (Tr. 321).

On December 18, 2020, McMillen had an initial visit with neurosurgeon James Anderson, M.D. She described her neck pain as 10/10 with pain radiating into her bilateral shoulders and posterior arms, with global paresthesia in her bilateral upper extremities. (Tr. 786). She was experiencing two or three headaches weekly that she attributed to her neck pain. (*Id.*). She also had radiating pain in her bilateral anterior thighs, and had upper and lower extremity weakness, with spasms and cramps. (*Id.*). She noted prior treatment had included physical therapy, massage therapy, heat/cold, TENS unit, neck collar and back brace, cortisone injections, pain clinic, trigger point injections, medications, laying down, and reclining. (*Id.*).

4

Dr. Anderson ordered lumbar and cervical x-rays. (Tr. 780-81). A lumbar x-ray from January 15, 2021, showed mild degenerative changes without instability, while a cervical x-ray from the same date revealed lower cervical predominant changes, including moderate to severe disc height loss at C6-7, without dynamic instability. (*Id.*). A cervical CT from February 2, 2021, showed degenerative changes with severe canal stenosis most severe at C6-7. (Tr. 779). Dr. Anderson interpreted the CT scan to show spontaneous fusion in the facet at C2-3 on the right side with severe spurring at C3-4 and C4-5 on the right facets. (Tr. 778). The superior articulating process of right C4 was fractured. (*Id.*). Based on the CT, Dr. Anderson recommended a C6 corpectomy with removal of the C5-6 and C6-7 discs. (Tr. 776).

An MRI performed on March 4, 2021, showed degenerative changes of the cervical spine, worst at C6-7 where disc herniation with posterior endplate osteophytes and apparent ossification of the posterior longitudinal ligament combine to deform the ventral spinal cord with minimal spinal cord abnormality on T2 due to minimal compressive myelopathy. (Tr. 802). On March 10, 2021, McMillen underwent an anterior cervical disc excision at C5-6 and C6-7 with a complete C6 corpectomy. (Tr. 797). Two weeks out from the surgery an x-ray showed a stable fusion, and McMillen indicated she was feeling improvement in her pain and paresthesia. (Tr. 793). The plan was for her to wear a neck brace for 6-8 weeks and to use a bone stimulator for a year. (Tr. 863).

As of May 21, 2021, when she was 10 weeks post-surgery, McMillen reported reduced numbness and tingling, and was beginning physical therapy to address upper extremity strength. (Tr. 898). By May 24, 2021, McMillen was attending physical therapy twice weekly. (Tr. 876). An x-ray dated July 2, 2021, showed her spinal alignment was holding steady, and she reported she was starting to feel better. (Tr. 895).

On May 4, 2022, McMillen reported to Dr. Hanicak that she was "having a hard time overall" and that her neck pain was causing continual spasms and weakness in her arms and legs. (Tr. 984). Her surgery had only helped "minimally" and she was still experiencing numbness in her arms and left leg weakness. (*Id.*). She was having a difficult time lifting, bending, sitting or standing for prolonged periods, and she was struggling to use her hands for simple tasks. (*Id.*). She was being considered for another surgery. (*Id.*). Her assessment included asthma; COPD; attention deficit disorder; depression; insomnia; chronic bilateral shoulder pain, cervical disc disorder with myelopathy; herniated cervical discs C4-5, C5-6, C6-7; and chronic midline lower back pain. (Tr. 987-88).

As of July 18, 2022, McMillen continued receiving pain management. (Tr. 1012). A cervical x-ray from September 30, 2022, showed no hardware related complications with her fusion and mild degenerative changes. (Tr. 997). Dr. Anderson noted that there appeared to be pseudoarthritis at the corpectomy site and opined that further surgical treatment would require additional levels of fusion and decompression. (Tr. 995-96). He noted disc protrusions at C3-4, C4-5. (Tr. 992). On October 7, 2022, she reported ongoing weakness in her right upper extremity and chronic neck pain. (Tr. 1084). She received trigger point injections which she had found beneficial in the past. (Tr. 1085). An x-ray of her thoracic spine on October 7, 2022, showed the disc spaces to be maintained, however osteophyte formation was present. (Tr. 1073). A cervical CT from October 18, 2022, showed a stable anterior fusion with degenerative changes similar to a previous examination. (Tr. 991). A cervical x-ray from November 2, 2022, showed "lots of arthritis." (Tr. 1060). At an office visit with Dr. Hanicak on December 16, 2022, McMillen was assessed with flank pain; dysfunctional uterine bleeding, trigger points of neck, intervertebral

cervical disc disorder with myelopathy; COPD; attention deficit disorder; and acute sinusitis. (Tr. 1107).

### C.     Medical Opinion Evidence

#### i.     State Agency Reviewers

On February 20, 2021, state agency reviewing physician Leon Hughes, M.D., determined that McMillen was capable of occasionally lifting and/or carrying 20 pounds, and that she could frequently lift and/or carry 10 pounds, consistent with a light exertional level. (Tr. 97). Dr. Hughes, however, limited her to six hours of sitting and four hours of standing or walking in an eight-hour workday. (*Id.*). Dr. Hughes further restricted McMillen to occasional climbing of ramps or stairs, with no climbing of ladders, ropes or scaffolds; frequent balancing, stooping, kneeling or crouching, but only occasional crawling; avoiding concentrated exposure to extreme heat or cold, humidity, fumes, odors, dust, gases, poor ventilation, etc.; and, avoiding all exposure to workplace hazards including dangerous machinery, unprotected heights and commercial driving. (Tr. 98).

On May 7, 2021, state agency reviewing psychologist Vicki Warren, Ph.D., found that McMillen had moderate limitations in interacting with others and adapting or managing oneself. (Tr. 94). Dr. Warren further determined that she was moderately limited in her ability to interact appropriately with the general public; in her ability to accept instructions and respond appropriately to criticism from supervisors; in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; in her ability to respond appropriately to changes to changes in the work setting; and, in her ability to set realistic goals or make plans independently of others. (Tr. 90).

At the reconsideration level on August 4, 2021, state agency reviewing psychologist Irma Johnston, Psy.D., confirmed the opinion of Dr. Warren, finding there were no changes alleged psychologically. (Tr. 106). State agency reviewing physician Lynne Torello, M.D. confirmed the opinion of Dr. Hughes, finding that the totality of the evidence in the file supported the initial administrative findings. (Tr. 110).

ii.      **Consultative Examination Reports**

On November 26, 2018, McMillen attended a consultative examination with Richard N. Davis, Psy.D. (Tr. 263-69). She reported being in special education classes before quitting school after completing the tenth grade due to pregnancy. (Tr. 263-64). She has given birth to two children and was married once for five years. (Tr. 264). She described past employment as a parking lot attendant and as an office worker at a furniture company. (*Id.*). She was most recently employed as a Home Health Aide. (*Id.*). She reported "bec[oming] involved" with alcohol and being arrested for driving under the influence. (Tr. 265). She has never been under the care of a mental health professional, although she is medicated for depression and anxiety, and claims a diagnosis for Post-Traumatic Stress Disorder. (*Id.*). She does perform some household chores, but only bathes once weekly. (*Id.*). She spends most of her time watching television, and she does not have friends or a social life. (*Id.*). She endorsed symptoms including crying spells, worthlessness, hopelessness, and guilt. (Tr. 266-67). Dr. Davis diagnosed McMillen with Adjustment Disorders with Mixed Anxiety and Depressed Mood and Post-Traumatic Stress Disorder, (seemingly somewhat severe at this time.). (Tr. 267).

Dr. Davis opined that McMillen seemed to have the abilities to understand, remember and carry out instructions well enough to remain employed. (*Id.*). He described her as tearful when describing her current situation. (*Id.*). Dr. Davis felt that she did not have trouble getting

along with people in positions of authority or co-workers. (*Id.*). He noted that McMillen reported having no trouble with he stresses and pressures of her employment in the past. (*Id.*).

On April 12, 2021, McMillen attended a second consultative examination with Ryan Wagner, Psy.D. (Tr. 803-09). She reported having two children, although one had passed away. (Tr. 804). McMillen suggested her own work limitations included concentrating, emotional breakdowns, adapting to workplace changes, and attending consistently to work duties. (*Id.*). She reported mental health symptoms including crying spells, low energy, hopelessness, worthlessness, indecisiveness, irritability, guilt, anhedonia, low motivation, insomnia, poor concentration and mood, social withdrawal, arousal, avoidance, flashbacks, hypervigilance, intrusive thoughts, nightmares, trust issues, detachment, and panic attacks. (Tr. 804-05). She has not been treated for mental health in several years although she is prescribed medications by her primary care physician. (Tr. 805). She reported living with her father and having low motivation for household chores. (*Id.*). She is too anxious to shop and spends most of her time watching television. (*Id.*). She reported regular, positive contact with family, but only minimal non-familial socialization. (Tr. 806). Dr. Wagner diagnosed McMillen with Post-Traumatic Stress Disorder and Major Depressive Disorder, recurrent, moderate. (*Id.*).

Dr. Wagner's opinion suggested no significant issues with understanding and carrying out instructions, or with concentration and persistence. (Tr. 807). He did indicate that McMillen's depression could impact her interpersonal interactions. (*Id.*). He noted that she presents as emotionally overwhelmed, with difficulty managing daily activities contributing to avoidance of completing daily tasks. (*Id.*).

###### iii.    Treating Source Opinions

On December 13, 2019, McMillen's treating physician, Dr. John Hanicak, M.D., completed a Medical Source Statement concerning her physical capacity. (Tr. 270-71). Dr. Hanicak opined that McMillen could occasionally lift less than five pounds and frequently lift less than one pound; could sit, stand or walk less than 30 minutes of an eight-hour workday, and zero hours without interruption; could occasionally balance, crouch or kneel, but could rarely climb, stoop, crawl, reach, push/pull, handle or finger; had restrictions relating to heights, moving machinery, temperature extremes and pulmonary irritants; had been prescribed a brace and a TENS unit; experiences severe pain that interferes with concentration, takes her off task and causes absenteeism; needs to elevate her legs to 45 degrees at will; and, requires additional breaks throughout the workday. (*Id.*). Dr. Hanicak further opined on May 24, 2022, that McMillen was completely disabled due to her medical condition and ongoing physical issues. (Tr. 1100).

##### D.    Administrative Hearing Evidence

On February 1, 2022, McMillen testified before the ALJ that she had last worked in January of 2018. (Tr. 46). McMillen felt she was no longer able to work because she was in too much pain, and she had weakness in her hands and arms that caused her to drop anything she tried to hold. (Tr. 47). She also reported weakness and numbness in her legs, and that she was finding it difficult to even brush her teeth. (*Id.*). She has trouble sleeping as she is constantly changing positions, and she spends most of her day just watching television. (Tr. 48). She does do dishes and cook but she can only do small trips to the grocery store. (Tr. 48-49). She has a handrail and bath seat in her shower. (Tr. 49).

McMillen testified that she feels the most pain in her neck shoulders and occasionally in her lower back. (*Id.*). She has a history of fusion surgery at C6-7, and her neurosurgeon has told her that her C2-3 have started to fuse together on their own. (Tr. 50). She was also told that her C4 and C5 have further deteriorated since her surgery. (Tr. 49-50). She has a hard time lifting a gallon of milk and can only sit or stand for short periods of time. (Tr. 50).  It is hard for her to hold her head up. (*Id.*). She is unable to use a keyboard or a tablet because it causes stiffness in her neck and arms. (*Id.*). She only goes outside to sit on the front porch or get the mail. (Tr. 51). Her hands and fingers will cramp up after a minute or two of use, such as when she brushes her teeth, and she drops things at least once or twice daily. (Tr. 51-52). She wears a neck brace once or twice daily and she also uses a bone growth stimulator. (Tr. 52). She has attended physical therapy and uses pain medication, including Vicodin, and muscle relaxers. (Tr. 53).

The VE then testified that McMillen's past work included Cashier II, DOT #915.473-010, which is light and unskilled; Material Handler, DOT #929.687-030, which is medium and semi-skilled with an SVP of 3; and, plumbing hardware assembler, DOT #706.684-086, which is light and unskilled with an SVP of 2. (Tr. 55-56). For her first hypothetical the ALJ had the VE consider an individual who could occasionally lift or carry 10 pounds, and frequently lift or carry less than 10 pounds; who could stand or walk for 4 hours of an 8 hour workday, and sit for 6 hours; who could occasionally use foot controls with the left lower extremity; who could never climb ladders, ropes or scaffolds, but could occasionally climb ramps or stairs, balance, stoop, kneel, crouch or crawl; who could occasionally reach overhead and frequently handle, finger, and feel; who should avoid all concentrated exposure to extreme heat or cold, humidity, fumes, odors, dust, gases and poor ventilation; who should avoid commercial driving, unprotected heights and dangerous machinery; who could perform simple, routine tasks without fast pace,

11

strict quotas or frequent duty changes; who can meet production requirements, allowing for a flexible goal-oriented pace; who can maintain focus, persistence, concentration, pace and attention to engage on such tasks for two-hour increments for eight-hour workdays within the confines of normal work breaks and lunch periods; and, could tolerate occasional and superficial interaction with supervisors, coworkers and the public, with superficial meaning no arbitration, negotiation or confrontation. (Tr. 56-57). The VE opined that this individual could not perform McMillen's past work, but would be capable of working as a mail clerk, DOT # 209.687-026, light, SVP of 2, with 22,000 jobs in the national economy; an office helper, DOT #239.567-010, light, SVP 2, with 36,000 jobs in the national economy; and, a final assembler, DOT #713.687-018, sedentary, SVP 2, with 12,000 jobs in the national economy. (Tr. 58-59).

The VE further opined that an individual is precluded from work if they are off task 20% or more of the workday, and that the maximum an employer would tolerate would be one absence per month. (Tr. 59). Counsel for the defendant then posed a hypothetical to the VE, adopting the ALJ's first hypothetical but reducing the time the individual could stand or walk from four hours of an eight-hour workday down to two hours, and reducing handling, fingering and feeling from frequent to occasional. (Tr. 59-60). The VE opined that the limitation to occasional handling, fingering, and feeling in particular would eliminate all jobs in the national economy. (Tr. 60). Finally, the ALJ inquired whether there would be jobs available if the individual were limited to two hours standing or walking, but handling, fingering and feeling were maintained on a frequent basis. (*Id.*). The VE testified that this individual could still perform the job as a final assembler, and added the jobs of sorter, DOT #521.687-086, sedentary, SVP 2 with 13,000 jobs in the national economy and addresser, DOT #209.587-010, sedentary, SVP 2 with 15,000 jobs in the national economy. (Tr. 60-61).

IV.      **The ALJ's Decision**

In her decision dated February 22, 2023, the ALJ made the following findings:

1.      The claimant has not engaged in substantial gainful activity since November 19, 2020, the application date (20 CFR 416.971 *et seq*.).

2.      The claimant has the following severe impairments: attention deficit hyperactivity disorder (ADHD, anxiety, depression cervical degenerative disc disease, lumbar degenerative disc disease, chronic obstructive pulmonary disease (COPD), asthma, emphysema, chronic pain syndrome, postlaminectomy syndrome status post-surgery at C5-C6 and C6-C7 with C6 corpectomy, cervical radiculopathy, and degenerative changes of the thoracic spine. (20 CFR 416.920(c)).

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except she can occasionally lift and or carry 10 pounds occasionally and less than 10 pounds frequently. She could stand and/or walk about two hours in an eight-hour workday and sit about six hours. She could occasionally use foot controls with her left lower extremity. She could never climb ladders, ropes, or scaffolds. She could occasionally climb ramps or stairs. She could occasionally crawl, balance, stoop, kneel, or crouch. She could occasionally reach overhead with her bilateral upper extremities. She should avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dust, gases, and poor ventilation. She should avoid commercial driving, unprotected heights, and dangerous machinery. She can perform simple, routine tasks without a fast pace, strict quotas, or frequent duty changes. She can meet production requirements that allow a flexible and goal-oriented pace. She can maintain the focus, persistence, concentration, pace, and attention to engage in such tasks for two-hour increments, for eight-hour workdays, within the confines of normal work breaks and lunch periods. She can tolerate occasional and superficial interaction with supervisors, coworkers and the public, with superficial meaning no arbitration, confrontation, or negotiation.

5.      The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.      The claimant was born on February 1, 1974, and was 46 years old, which is defined as younger individual age 45-49, on the date the application was filed (20 CFR 416.963).

13

7.   The claimant has at least a high school education (20 CFR 416.964).

8.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills (See SSS 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since November 19, 2020, the date the application was filed (20 CFR 416.920(g)).

(Tr. 14-40).

## V.   Law and Analysis

### A.   Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine

whether a claimant is entitled to benefits:

1.   whether the claimant is engaged in substantial gainful activity;

2.   if not, whether the claimant has a severe impairment or combination of impairments;

3.   if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.   if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.   if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[2]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.     Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of

---

[2] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.*  Generally, these regulations are duplicates and establish the same analytical framework.  For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI.     Discussion

McMillen brings two issues for this Court's review:

1.      Whether the ALJ cherry-picked evidence in finding McMillen capable of frequent bilateral handling, fingering and feeling; and

2.      Whether the ALJ failed to establish a logical bridge in evaluating pain symptoms.

(ECF Doc. 12, p. 1).

**A.      The ALJ's decision that McMillen was capable of frequent bilateral handling, fingering, and feeling was supported by substantial evidence.**

McMillen first argues that the ALJ's determination that she was capable of frequent bilateral handling, fingering, and feeling was a result of cherry-picked evidence that ignored other parts of the record supporting a more restrictive RFC. (*Id.* at pp.12-15). McMillen describes the evidence regarding hand limitations, and, accordingly, fingering and manipulative issues as "compelling." (*Id.* at p. 13). Specifically, she notes reporting numbness and tingling into her arms and hands to her physician in both February and March 2020. (*Id.*). These reports were made to both her primary treating source, Dr. Hanicak, and to her pain management physician. (*Id.*). McMillen further reported numbness and weakness in her right upper extremity, and stated she repeatedly dropped items, which Dr. Hanicak found consistent with a diagnosis of cervical spinal canal stenosis. (*Id.*). An examination in December 2020 revealed decreased arm strength in her bilateral upper extremities. (*Id.*).

McMillen further argues that even after a cervical disc excision and corpectomy in March 2021, she continued to report pain, weakness, and numbness into her upper extremities. (*Id.* at p.14). McMillen continued to report difficulty using her hands, and examinations continued to show decreased sensory distribution in the upper extremities consistent with her statements of weak and numb hands. (*Id.*). At her hearing, McMillen testified that she could not hold anything for a long time, and she dropped items without realizing it. She struggled to lift a gallon of milk, or to use a keyboard, phone, or tablet. (*Id.*).

The Commissioner responds by noting that the ALJ's RFC was more restrictive regarding manipulatives than either state agency medical examiner, neither of whom, despite having considered Dr. Hanicak's opinion, suggested any limitation for handling, fingering, or feeling. (ECF Doc. 14 at pp. 9-10). The Commissioner argues that the ALJ discussed evidence that

17

weighed both against and in favor of granting benefits, acknowledging that McMillen testified she dropped things once or twice per day because she was unable to feel objects in her hand. *(Id.* at p. 10). The Commissioner further suggests that the ALJ considered evidence from the period immediately following McMillen's disc excision and corpectomy, as well as records from 2022 that noted radiation of pain to the shoulders and arms and decreased sensory distribution in the bilateral upper extremities. (*Id.*, at pp. 10-11). The ALJ further weighed all of the opinions in the record, and reasonably assessed their persuasiveness. (*Id.* at p. 11).

Even when an ALJ finds a medical source's opinion persuasive or consistent and well-supported, "there is no requirement that an ALJ adopt [a medical source's] limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). So long as the ALJ's RFC determination considered the entire record, the ALJ is permitted to make necessary decisions about which medical findings to credit and which to reject in determining the claimant's RFC. *See Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013) ("The ALJ parsed the medical reports and made necessary decisions about which medical findings to credit, and which to reject. Contrary to [the claimant's] contention, the ALJ had the authority to make these determinations."). However, an ALJ improperly "cherry-picks" evidence when his decision does not recognize a conflict between the functional limitations described in a medical opinion and the ALJ's RFC finding and explain why he chose to credit one portion over another. *See Rogers v. Comm'r of Soc. Sec.*, No. 5:17-cv-1087, 2018 WL 1933405, *13 (N.D. Ohio Apr. 24, 2018) citing *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013); *see also Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (stating that, if a medical source's opinion contradicts the ALJ's RFC finding, the ALJ must explain why he did not include the limitation in his RFC determination).

18

Here, it is clear that the ALJ took into account all medical and opinion evidence in the record, and offered a reasoned explanation of how each was evaluated. Specifically, the ALJ noted that she found the state agency physical health consultants only partially persuasive owing to the additional medical evidence that was added to the record after the opinions were rendered. The ALJ addressed evidence added to the record that McMillen was having difficulty using her hands to perform simple tasks, and adjusted her RFC to reflect limitations in handling, fingering, and feeling that were not included in the state agency consultants' opinions. The ALJ also addressed the treating source opinion of Dr. Hanicak, who opined that McMillen could "rarely reach, push/pull, and perform fine and gross manipulation. (ECF Doc. 9, p. 13). Dr. Hanicak later opined that McMillen's medical conditions and ongoing physical issues would render her completely disabled. (*Id.*). The ALJ found these opinions unpersuasive because they "relied heavily upon [McMillen's] subjective reports of symptoms and limitations, and . . . did not provide specific objective evidence of examination to support these opinions." (*Id.*). The ALJ further added that Dr. Hanicak's "own treatment records did not support such extreme limitations." (*Id.*).

In light of the mostly subjective nature of the medical evidence included in the record, the ALJ correctly looked to the expert opinions for guidance, and properly weighed each, and adjusted her own RFC accordingly. Courts "regularly find that substantial evidence supports a no-disability determination when the ALJ relies primarily on independent medical advice consistent with the [plaintiff's] medical records." *Dyson v. Comm'r of Soc. Sec.*, 786 F. App'x 586, 590 (6th Cir. 2019). Dr. Hughes and Dr. Torello, after reviewing McMillen's medical records, opined that there were no manipulative limitations justified by the evidence. That the ALJ added some limitations based on subsequently added records further indicates that this was

a thorough assessment of the evidence, and not one dependent on cherry-picked facts that supported a predetermined conclusion. As the Commissioner argues, "the law does not require the ALJ to discuss every piece of evidence that is supportive or inconsistent with the RFC." (ECF Doc. 14, at p.12, citing *Byler v. Kijakazi,* 2022 WL 980099 at *8 (N.D. Ohio Jan. 21, 2022)). The RFC must simply be supported by substantial evidence, and the ALJ met that burden.

> **B.**    **The ALJ established a logical bridge in evaluating pain symptoms.**

McMillen next argues that the ALJ failed to address her pain symptoms when formulating her RFC as required under Social Security Ruling ("SSR") 16-3p. (ECF Doc. 12, p. 15). McMillen correctly notes that SSR 16-3p provides a two-step process to determine whether an individual's pain symptoms are medically supportable. The first step requires a determination of whether the individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms. The second step requires an evaluation of the intensity and persistence of an individual's symptoms to determine extent to which the individual's symptoms limit her abilities to perform work-related activities. McMillen cites SSR 16-3p which provides:

> In considering the intensity, persistence, and limiting effects of an individual's symptoms. We examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case.

SSR 16-3p.

McMillen contends that the ALJ did not properly assess the evidence pursuant to the guidance set forth in SSR 16-3p, but, rather, offered only boilerplate language to support her assessment of the impact McMillen's pain had on her RFC. (ECF Doc. 12, p. 17). In so doing,

McMillen argues, the ALJ failed to build an accurate and logical bridge between the evidence and the RFC. (*Id.*, citing *White v. Comm'r of Sec. Sec.,* No 1:20-CV-00588-JDG, 2021 WL 858662, at *20 (N.D. Ohio, Mar. 8, 2021)). McMillen notes several references in the record to her complaints of pain, including statements made at the Cleveland Clinic Pain Center, and to her treating physician, Dr. Hanicak. (ECF Doc. 12, p. 18). She further notes objective findings in the record that she argues support her statements of pain, including painful range of motion of the neck, inflammation of the right side of the neck, tenderness to palpation in the paraspinal and trapezius muscles, severe spasms of the bilateral lower back, left foot drop, decreased lumbar range of motion, lower extremity weakness (4/5), absent reflexes, positive Hoffman's signs bilaterally, positive left straight leg raise, slow, guarded and antalgic gait, and decreased upper extremity strength. (ECF Doc.12, pp.18-19). While McMillen acknowledges the ALJ referenced "a portion of this evidence in the discussion of pain," she argues that there is no logical bridge between the evidence and the RFC. (*Id.,* at p. 19).

The Commissioner responds that the ALJ's explanation of McMillen's subjective complaints was "more than adequate," so the findings must stand as "[i]t is for the administrative law judge, not the reviewing court, to judge the consistency of a claimant's statements against the record evidence." (ECF Doc. 14, p.13, citing *Lipanye v. Comm'r of Soc. Sec.,* 802 F. App'x 165, 171 (6th Cir. 2020)). The Commissioner notes that the ALJ's referenced evidence of treatment McMillen received for her pain throughout 2021 and 2022 in her decision, and also considered the impact of the treatment. (*Id.* at pp. 13-14). Per the Commissioner, the ALJ also considered testimonial evidence where McMillen indicated she was receiving benefit from her pain medications without side effects. (*Id.* at p.14). By weighing all of this evidence, the ALJ complied with SSR 16-3p when evaluating complaints of pain. (*Id.* at p.15).

The Commissioner further contends that the ALJ also properly considered opinion evidence and found greater restrictions on McMillen's functionality than the state agency consultants, and provided an adequate explanation for her determinations regarding subjective complaints. (*Id.,* at pp.15-16). McMillen, the Commissioner argues, is inappropriately asking this Court to reweigh the evidence in her case, and it is the Agency's position that the invitation must be declined.

When evaluating a claimant's subjective complaints of pain, the ALJ must determine whether there is objective medical evidence from an acceptable medical source showing that the claimant has a medical impairment that could reasonably be expected to produce the alleged pain. If there is, the ALJ considers all the evidence to determine the extent to which the pain affect's the claimant's ability to work. *Heart v. Comm'r of Soc. Sec.,* 2022 WL 19334605 (6th Cir., Dec. 8, 2022), citing 20 C.F.R. § 416.929 (a)-(c). The review in this case must be deferential. A reviewing court "must affirm the ALJ's decision as long as it is supported by substantial evidence and is in accordance with applicable law." *Showalter v. Kijakazi,* 2023 WL 2523304 (6th Cir., Mar. 15, 2023). McMillen's argument does not overcome this deferential standard of review.

In conducting her analysis, the ALJ found, and the Commissioner does not contest, that the claimant's condition met the first prong of two-step analysis, in that there is objective medical evidence of an impairment that could reasonably expected to produce the alleged pain. The decision is replete with references to imaging and examinations conducted by various treating sources that established significant cervical and lumbar spinal disease. Specifically, a lumbar MRI on November 24, 2020, established moderate bilateral foraminal narrowing and minimal canal narrowing at L3-4, mild disc degenerative signal changes at L4-5 since her prior

study and L5-S1 mild degenerative disc signal changes and mild to moderate facet degenerative changes. There was moderate right and severe left foraminal stenosis. (Tr. 322). Cervical imaging completed on January 15, 2021, showed severe cord compression at C6-7 and, to a lesser degree, at every other level of the cervical spine. (Tr. 919.). This was confirmed by cervical CT on February 2, 2021. (Tr. 779) There was also spontaneous fusion in the C2-3 facet on the right side and severe spurring at C3-4 and C4-5. On the right facet and the superior articulating process of the C4 on the right was fractured. (Tr. 778). The imaging led McMillen to undergo disc excisions at C5-6 and C6-7 and a C6 corpectomy on March 10, 2021. (Tr. 797).

Having determined there was objective medical evidence showing that there was an impairment that could reasonably be expected to produce the alleged pain, the ALJ was next charged with determining the extent to which that pain would affect McMillen's ability to work. In making this determination, the ALJ noted that "[d]espite her complaints that her pain prevents her from working, she did testify that she was able to drive. She reported that she was doing 'OK' with her current medications, and that they were helping without concerning side effects." (Tr. 959) The ALJ further discussed McMillen's pain management care, and noted that "records showed ongoing pain in the neck and back with radiation in to the shoulders, arms and back with radiation down the legs. . . she described the pain as 8/10 on an increasing pain scale. Examination showed that the claimant had limited lateral mobility in the cervical spine…[s]he had decreased sensory distribution down the bilateral upper extremities." (Tr. 1124). The examination notes also showed she had a normal gait and did not require an assistive device, and the ALJ determined the impairments were not work preclusive. (*Id.*).

The ALJ's analysis of the records also included McMillen's limited ability to participate in physical therapy due to pain but noted that her doctors continued to recommend physical

23

therapy and injections to address her pain. (Tr. 342). McMillen reported to Dr. Hanicak that she was doing "ok" with her current medications, and that they were helping without concerning side effects. (Tr. 959). On May 24, 2021, while describing her pain as a "6/10" and noting that the pain was burning, tingling, throbbing, and stabbing, McMillen again reported her medications were helping with pain control and improving her functioning. (Tr. 876). In July 2021, McMillen reported she was starting to feel a little bit better. (Tr. 897). She continued treating her pain through September 2022, but continued to report her pain was better with medications. (Tr. 992).

In addressing the expert opinions, the ALJ noted she found the state agency experts only "partially persuasive because they are partially supported by and consistent with the evidence." (*Id.,* at p. 12). In deriving her RFC, the ALJ gave "somewhat greater limitations" than the state agency experts "to account for later medical records and the claimant's testimony regarding pain." (*Id.*). The ALJ found Dr. Hanicak's opinions not persuasive as he "relied heavily upon the claimant's subjective reports of symptoms and limitations, and he did not provide specific objective evidence or examination findings to support those opinions." (*Id.,* at p. 13). She further noted that Dr. Hanicak's "own treatment records did not support such extreme limitations." (*Id.*).

It is clear that the ALJ gave thoughtful consideration to McMillen's subjective complaints of pain when formulating her RFC. She cited evidence both in favor of, and in opposition to, further limitation based on those subjective complaints, noting in particular McMillen's ability to drive and to walk with a normal gait. The ALJ also referenced the consistent benefit McMillen received from pain medication. Most notably, the ALJ adopted a more restrictive RFC than that suggested by state agency experts specifically to account for subjective complaints of pain. The ALJ has provided a logical and accurate bridge from the evidence to the RFC, allowing McMillen and the reviewing court to understand her reasoning.

Accordingly, the ALJ has met her burden, and this Court must defer. I therefore decline to remand on this basis.

      Based on the foregoing, the decision of the ALJ is AFFIRMED.

Dated: November 7, 2024

                                        Reuben J. Sheperd
                                        United States Magistrate Judge